DECISION
Plaintiff appeals the real market value of its property, identified as Account 251126, for tax year 2006-07. A trial was held in the Oregon Tax Courtroom on Thursday, March 13, 2008. Neil R. Bryant, Attorney at Law, appeared on behalf of Plaintiff. Scott Walley (Walley), Vice President, Finance for Pronghorn Investors LLC, and Dana L. Bratton (Bratton), MAI, Bratton Appraisal Group LLC, testified for Plaintiff. Laurie E. Craghead, Assistant Legal Counsel, Deschutes County, appeared on behalf of Defendant. Paul E. Bilkstad (Bilkstad) and Anthony Raguine (Raguine), Senior Planners, Deschutes County Planning Department, and Todd Straughan (Straughan), Appraiser, testified for Defendant.
The parties offered Plaintiff's Exhibits 1 and 2 and Defendant's Exhibits A, B, C, and D without objection.
 I. STATEMENT OF FACTS
The subject property, a 10.46 acre parcel of undeveloped land, [1] is part of a 640 acre destination resort known as Pronghorn. (Def's Ex A at 1.) Walley testified that the subject property is surrounded by land owned by the Bureau of Land Management and offers home *Page 2 
sites and fractional ownership interests. He testified that the "core facilities" include the Trail Head (a recreation center with a bar and grill), swimming pool, tennis courts, golf clubhouse, sales building, and two golf courses, one designed by Jack Nicklaus and another designed by Tom Fazio.
Walley testified that as of January 1, 2006, the assessment date, there were "289 lots platted," and that three buildings with four units each, the Trail Head, and the Jack Nicklaus designed golf course were complete. The subject property is surrounded by the twelfth and eighteenth holes on the Nicklaus designed golf course and in close proximity to two other holes, the "Nicklaus Academy," the Trail Head, and the golf clubhouse. (Def's A at 6, 16.) As of the date of assessment, there were no buildings under construction and no infrastructure (roads) in place on the subject property. Walley testified that the original three year building deadline approved by the planning department was extended "at least once." Bilkstad testified that Plaintiff secured land use permits, filed a plan for a destination resort, and public hearings were held. Raguine testified that the final master plan was approved December 15, 2005.
Walley testified that, as of the trial date, 165 of the 289 platted lots had been sold. He testified that the average selling price was $492,000 which included a $70,000 golf club membership fee. Walley computed an average selling price of $16.84 per square foot, less the golf membership fee. He testified that lots adjacent to the Nicklaus golf course sold at an average price of $14.63 per square foot because the lots "are smaller" and the "views are less spectacular" than for lots situated along the Fazio golf course. Walley estimated that the average lot development costs for infrastructure was $43,000 per lot, the finance carrying cost was four to five percent, and the profit margin was 20 percent. Walley testified that, in July 2005, lots 145 through 159, a 7.45 acre parcel with no roads near the Nicklaus golf course (the "Nicklaus side"), were sold to a developer for $5,208,000, including golf membership fees. The selling price *Page 3 
without the golf membership fees was $4,158,000, or approximately $12.81 per square foot. Walley testified that a real market value of $3,528,000 rather than the current tax roll value of $18,923,520 for the subject property is correct.
Bratton, after describing his education, certification, and professional experience, reviewed his appraisal reports. (Ptf's Exs 1, 2.) He testified that his appraisal report prepared February 22, 2007, was a "retrospective" appraisal back to the assessment date of January 1, 2006, and he looked at residential properties in the core area (Redmond and Bend). Bratton testified that he used the comparable sales approach because the cost and income approaches are not applicable to vacant land. He concluded that the highest and best use for the subject property was residential development. Bratton testified that the subject property is most like a high density site zoned for residential development. He concluded that comparable sale 8, which was a 7.39 acre parcel located on the east side of Bend and zoned RH, was a close match to the subject property. Bratton testified that the sale price of comparable sale 8 was $8 per square foot. He determined that the real market value of the subject property should be $8 per square foot, or $3,360,000.
Bratton testified that, on October 12, 2007, he prepared a second summary appraisal report and noted that .8 acre of the subject property was under development. (Ptf's Ex 2 at 2.) He testified that for this report his focus was to spend "more time studying other destination resort sales located in Bend and Redmond." Bratton concluded that the best comparable was sale 10, a 14 acre parcel located at the Inn of the Seventh Mountain, which is a destination resort in Bend. (Id. at 52.) Comparable sale 10 sold in June 2006, for $3,175,000 or $5.21 per square foot. (Id.) Bratton testified that comparable sale 10 has "positive amenities" but does not have "golf course frontage." Straughan testified that this is not a gated community nor is it new like Pronghorn. Bratton countered that the owners of the property "injected $5 million" to "upgrade common areas" and bring the "condos back to their heyday." He testified that the property is *Page 4 
located close to a golf course, clubhouse, swimming pool, and tennis courts, plus the users have "access to the City of Bend amenities." Bratton discussed comparable sale 11, a 55.2 acre parcel located in Cascade Highlands Resort Property (formerly known as Broken Top and now known as Tetherow), which sold in May 2006 for $10,200,000 or $4.24 per square foot. (Id. at 53.) Bratton testified that comparable sale 11 will have "golf course frontage" and the lots have been "approved" for development. He testified that the Broken Top golf course was designed by "Wiskoff" and the golf course at Tetherow which is under construction was designed by "McKay." Straughan testified that it is not a gated community; Bratton responded that it will be one. Bratton commented that a "larger piece" of property "sells for less per square foot."
Bratton was questioned about how to determine the real market value of land when a property was approved for development of residential lots and there were sales of developed lots. Bratton testified that the "subdivision development analysis" method is used. He testified that "all costs" (direct and indirect including selling costs) and profit are deducted from the selling price of the lots, and then that amount is "discounted" to present value, taking into account "the absorption-sale of lots per year" to determine the land value. Bratton testified that the subdivision analysis method is "complex" and "variables alter assumptions."
Bratton was asked if the same residential buyers in the Redmond and Bend area would or could afford to buy in Pronghorn. He testified that Pronghorn buyers are "recreational buyers" and those properties are at the "high end of the range." Straughan testified that the "typical buyer" in Pronghorn comes from "outside the area" and is not likely to be interested in "affordable housing in Redmond," a reference to one of Bratton's properties selected as comparable to the subject property.
Bratton testified that, as of January 1, 2006, the "market was healthy," but "later in `06 things slowed down." He was asked why none of his sales were "time trended" and about the *Page 5 
comparability of his sales to the subject property, specifically size, zoning, access, proximity to commercial businesses and amenities.
Straughan, a certified residential appraiser and three year employee of Defendant, presented his appraisal report. (Def's Ex A.) He testified that, as of the assessment date, there were no buildings on the subject property. Staughan concluded that land sales of properties located in Bend or Redmond were not comparable to Pronghorn, because Pronghorn is a "unique community and cannot be compared to other major markets within Deschutes County." (Def's Ex A at 9.) He located three reported sales of land in Pronghorn between November 2005 and March 2007. The lots ranged in size from .54 acres to .72 acres, and the sale prices ranged from $28.17 per square foot to $34.01 per square foot. (Id.) Walley testified that those lots would have frontage along the Fazio course after it is built. Straughan testified that he found three land sales (each approximately one half acre) located in Eagle Crest, a destination resort, which he described as "more of a `middle-class' resort." (Id. at 11.) The sale prices for those sales ranged from $11.91 per square foot to $12.61 per square foot. (Id.) The land sale prices for all sales presented by Straughan ranged from $4.16 per square foot in Redmond to $34.01 per square foot in Pronghorn. (Id. at 9 through 12.)
Straughan testified that he used the "`residual' valuation method to estimate the value of the subject property." (Id. at 14.) Using two reported sales of buildings located on the subject property after the assessment date, Straughan reduced the recorded deed sales prices by the costs of the personal property and one golf membership. (Id. at 14.) Next, he multiplied that result by four, which is the number of "units per building" to compute a "total building and land" cost. (Id.) That amount was multiplied by 20 percent to arrive at a land value, which was multiplied by 16, the number of buildings to be constructed on the subject property, to determine the land value of the subject property. (Id.) Straughan testified that he selected a *Page 6 
"conservative 20 percent" land to building ratio after reviewing the multiple listing data in December 2005 and a sale of unimproved land in Redmond in 2001 that sold again in 2005 after five apartment buildings were built on the land. (See id. at 13.) Straughan testified that he reduced the computed land value by "$55,948/per acre * * * to reflect the lack of" municipal services. (Id. at 14.) Plaintiff questioned why there were no subtractions for the cost of building roads or other costs such as commission and marketing. Straughan determined a real market value of $17,847,000 or approximately $39 per square foot.
In response to questions about Straughan's computations, Walley testified that each fractional share owner is required to "make a membership fee deposit." He states that the membership fee of $5,500 should have been multiplied by 12 because there are potentially 12 fractional share owners per building and that total amount should be subtracted from the recorded deed sales prices. Walley testified that the two buildings were not built as of the assessment date and the current plan is to build 14, not 16, buildings on the subject property. Straughan testified that "16 buildings" were listed on the "Pronghorn website." Bratton characterized Straughan's approach as a "rudimentary subdivision format" which failed to include costs such as marketing and financing, a profit margin, and the "absorption period" to reflect the "time value of money" with no discount for a bulk purchase.
Straughan challenged the comparability of Bratton's comparable sales. Referencing pictures of each of Bratton's comparables, Straughan pointed out the differences between Bratton's comparable sales properties and Pronghorn. (Def's Ex D.) Plaintiff challenged whether the pictures accurately depicted the condition of the properties as of January 1, 2006, because the pictures were taken in December 2007 and March 2008. Straughan testified that Bratton's selected properties were not located in a gated community nor fronted by golf courses, and were located in inferior neighborhoods close to busy commuter traffic and commercial businesses. He *Page 7 
testified that some of the properties at the time of purchase were mobile home parks that would be transitioned to single family residential neighborhoods. Straughan conceded that there is "no perfect comp," but "like should be compared to like."
Straughan was questioned about the reference to Talarico v. DeschutesCounty Assessor, TC-MD No 010467F (Nov 23, 2001) (Talarico) in his appraisal report. (Def's Ex A at 14.) Straughan wrote that the "subject will be valued as a whole unit once construction is completed and units are converted to `Condominiums,' or separated into the 12 separate interests. Please see the Tax Court ruling Talarico vs. DeschutesCounty, Case no. 010467F, for more information on this method of valuation." (Id.) Plaintiff questioned whether Talarico is applicable to the facts of this case where the subject property is bare land and fractional interests are not being valued. Straughan explained that he was using the residual method and did not value the property "usingTalarico."
Plaintiff challenged Straughan's computed price per square foot. Bratton testified that the only property that sold for more than $40 per square foot was a commercial building in the Old Mill District in the central Bend business district. He testified that a small residential parcel located in Bend sold for approximately $40 per square foot.
The parties discussed the fact that Bratton's appraisal report was prepared under the rules and regulations of Uniform Standards of Professional Appraisal Practice (USPAP) . Straughan's appraisal report was not. Defendant stated that "no significance should be attached" to USPAP because Straughan followed the same procedures as Bratton and there would be no difference in Straughan's determination of value if he had followed USPAP. Plaintiff countered by reminding the court that Bratton is a state certified general appraiser with no restrictions as to the type or value of property he can appraise. *Page 8 
 II. ANALYSIS
The issue before the court is the real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. See Richardson v.Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. of Rev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [2] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
A. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable.See ORS 308.205(2); OAR150-308.205-(A)(2). The parties determined that only the comparable sales approach is applicable to the facts of this case.
B. Comparable Sales Approach
The comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant."Chambers Management Corp v. Lane County Assessor, TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, The Appraisal of RealEstate at 335 (12th ed 2001). When considering the comparable sales approach, the court looks for "arm's length sale transactions of property similar in size, *Page 9 
quality, age and location to [a plaintiff's] property in order to determine the real market value." Richardson, WL 21263620 at *3. The Oregon Supreme Court stated:
 "If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value."
Kem v. Dept. of Rev., 267 Or 111, 114, 514 P2d 1335 (1973).
The subject property, a 10.46 acre parcel, is located in a high-quality, gated destination resort, which offers special leisure amenities, including golf courses designed by signature architects, Jack Nicklaus and Tom Fazio. Location-dependent factors such as proximity to golf courses and other leisure time activities, limited public access, and overall increased prestige are important considerations in determining comparability between the subject property and other property. Bratton presented 16 sales of property located in the Bend and Redmond area as comparable to the subject property. He concluded that the sale most comparable to the subject property was a 14 acre parcel which is part of the expansion of the Inn of the Seventh Mountain in Bend. Bratton characterized the property as "a `direct match'." (Ptf's Ex 2 at 52.) The Inn of the Seventh Mountain is an older destination resort development, but not a gated community, and has no on-site amenities such as a golf course. The court concludes that this comparable sale, like the other comparable sales selected by Bratton, is lacking the critical location-dependent factors. The absence of those factors, which by their inherent nature represent quality and enhanced value, results in a lower price per square foot. The court does not accept Bratton's determination of $8 per square foot.
The court was presented with one sale of a 7.45 acre parcel of vacant land in Pronghorn. Walley testified that the bare land was sold to a developer in July 2005 for $4,158,000 (exclusive of golf membership fees) or approximately $12.81 per square foot. He testified that the parcel was located on the "Nicklaus side" and there were no constructed roads. That parcel, except for *Page 10 
size, is comparable to the subject property and the sale price reflects the critical location-dependent factors. In looking at the comparability of the 7.45 acre parcel and the subject property, the court acknowledges that the 7.45 acre parcel was sold approximately six months prior to the assessment date. The sale price was not time-trended to January 1, 2006. The parties agreed that the real estate market was "strong" as of the assessment date. There is a significant size difference between the subject property (10.46 acres) and the 7.45 acre property. The parties did not provide any evidence to assist the court in making adjustment for either time or size. Without any additional evidence, the court determines a $13 per square foot real market value for the subject property.
It is customary to determine a real market value after comparing estimated value using one or more of the valuation methods. In this case, the court was presented with only the comparable sales approach. The court looks at the evidence presented by the parties. Because there was only one reported large parcel sale in Pronghorn, the reasonableness of the estimated real market value of $13 per square foot must be compared to other reported sales in Pronghorn. The price per square foot compares favorably with sales of individual lots on the "Nicklaus side" and within the Pronghorn development. Walley testified that half-acre lots located in close proximity to the Nicklaus designed golf course sold on average for $14.63 per square foot. He testified that the average price for all lots sold in Pronghorn was $16.84 per square foot. Bratton testified, and the court accepts, that a larger parcel sells for a lower price per square foot than a smaller parcel. Given the size difference, it is reasonable to assume the price per square foot spread between a half-acre parcel and a 10.46 acre parcel could be greater; however, the court's determination is limited by the parties' evidence. *Page 11 
Defendant concluded that the subject property's real market value was approximately $41.60 per square foot. Defendant's determination was based on extracting a land value from the sale of a multi-unit building. Defendant failed to present reported land sale transactions of comparable size to the subject property to support its determination. The residential lot sales selected by Defendant undercut its determination. Defendant selected three lot sales, each approximately one-half acre in size, which were located in close proximity to the Fazio designed golf course. Those sales were clustered around the assessment date and ranged in price from $28.17 to $34.01. (Def's Ex A at 9.) The court cannot agree with Defendant that the price per square foot of a 10.46 acre undeveloped parcel would exceed the price per square foot of a developed one-half acre parcel.
C. Burden of Proof
Plaintiff bears the burden of proof, by a preponderance of the evidence, that it is entitled to the requested relief. "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon theparty seeking affirmative relief." ORS 305.427 (emphasis added). Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept.of Rev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRev., 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the RMV of their property." Poddar v. Dept. ofRev., 18 OTR 324, 332 (2005) (quoting Woods v. Dept. of Rev., 16 OTR 56,59 (2002) (citation omitted).
Defendant questioned whether Plaintiff carried its burden of proof. The court concludes that Plaintiff carried its burden of proof, offering a preponderance of evidence in support of its challenge to the tax roll value. *Page 12 
 III. CONCLUSION
After careful review of the testimony and evidence, the court concludes that the real market value of the subject property is $13 per square foot. Now, therefore,
IT IS THE DECISION OF THIS COURT that the real market value of the subject property identified as Account 251126, for tax year 2006-07, was $13 per square foot or $5,923,281.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Jill A. Tanner on May 22, 2008.The Court filed and entered this document on May 22, 2008.
Dated this _____ day of May 2008
[1] 455,637 square feet (Ptf's Ex 1 at 3.)
[2] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2005. *Page 1